Argued November 22, affirmed December 13, 1921,

# BOYD v. OLCOTT ET AL.

(202 Pac. 431.)

**Constitutional Law—Whether Amendment Properly Adopted is Judicial Question.**

1. Whether a constitutional amendment has been legally adopted by the legislature and approved by the people is for the courts to investigate and determine, unless the power to do so is lodged elsewhere by the express terms of the Constitution,

**Constitutional Law — No Conclusive Presumption from Governor's Proclamation, of Regularity in Adopting Amendment.**

2. Under Constitution, Article XVII, Section 1, as to adoption of constitutional amendments, the Governor's proclamation, declaring an amendment adopted, cannot give rise to a conclusive presumption of regularity in the adoption of the amendment.

**Constitutional Law—Constitution Generally Construed as Mandatory, not Directory.**

3. Constitutional provisions are usually construed as mandatory, not directory.

**Constitutional Law — Failure to Observe Requirement Fatal to Amendment.**

4. The provisions of Constitution, Article XVII, Section 1, as to amending the Constitution, are mandatory, and a failure to observe such requirements is fatal to a proposed amendment, even though the electors have with practical unanimity voted for it.

**Constitutional Law—Requirement That Amendment be "Entered in" Legislative Journals is Mandatory.**

5. The requirement of Constitution, Article XVII, Section 1, that a proposed amendment be "entered in" the legislative journals is mandatory.

**Constitutional Law—Presumption from Enrolled Bill Stated.**

6. While, as regards the regularity of adoption of a constitutional amendment under Constitution, Article XVII, Section 1, the journal entry rule in force in Oregon permits the impeachment of an enrolled bill by the legislative journals, yet the enrolled bill presents itself behind the shield of a presumption that it has been regularly enacted, which, while not conclusive, is overcome only by a clear showing of violation of the constitutional requirements.

---

3. Mandatory or directory nature of constitutional provision for amendment, see note in 15 Ann. Cas. 786.

6. On conclusiveness of enrolled bill, generally, see notes in 51 Am. Dec. 619; 85 Am. Dec. 357; 9 Ann. Cas. 582; 20 Ann. Cas. 350; Ann. Cas. 1918D, 253; 23 L. R. A. 340; 40 L. R. A. (N. S.) 1.

Constitutional Law—Mere Silence of Legislative Journals Raises No
    Presumption of Irregularity.

7. It will not be presumed from the mere silence of the legisla-
tive journals that either house has exceeded its authority or dis-
regarded constitutional requirements in the passage of legislative
acts.

Constitutional Law — Identifying Reference Sufficient Compliance
    With Requirement That Amendment be "Entered in" Legisla-
    tive Journals.

8. An identifying reference is a full compliance with the re-
quirement of Constitution, Article XVII, Section 1, that constitu-
tional amendments be "entered in" the legislative journals; the
quoted phrase meaning any kind of entry sufficient to afford identi-
fication.

Constitutional Law—Presumption That Joint Resolution Proposing
    Amendment was "Entered in" Senate Journal not Overcome.

9. House Joint Resolution No. 12 of the 1921 session, proposing
the constitutional amendment, Article XI-C, appears in the senate
journal only by a printed copy of the original resolution, without
the amendments made thereto in the house, although the senate
journal does not contain any affirmative declaration that the printed
copy inserted in the senate journal was a copy of the resolution
received from the house, so that the senate journal contains only
an implication that the printed copy is a copy of the form of reso-
lution adopted by the senate. *Held*, that such implication is in-
sufficient to outweigh the presumption attaching to the enrolled
resolution that the resolution as amended was "entered in" the
senate journal, as required by Constitution, Article XVII, Section 1,
especially in view of admitted legislative practice, so that Con-
stitution, Article XI-C was validly adopted.

Constitutional Law—Presumption in Favor of Validity of Constitu-
    tional Amendment.

10. Under Constitution, Article IV, Section 13, where house jour-
nal affirmatively showed the senate amendments to a house bill were
concurred in by the house, it would be presumed, in the absence of
affirmative showing to the contrary, that the vote was in fact taken
by yeas and nays, and that the constitutional majority voted for
concurrence.

Statutes—Statute Held not Void Because not Submitted to People.

11. Where a statute contained a provision for its submission to
the people at an election, but the legislature did not in fact direct
that it be submitted, and treated the provision as superfluity, and
the statute contained nothing requiring its submission to the people,
*held* that it was not necessary to submit it.

8. On construction of requirement that proposed constitutional
amendment be entered in journals, see notes in 1 **Am. St. Rep.** 21;
3 **Ann. Cas.** 756; 6 **A. L. R.** 1227.

**Statutes — Statute not Invalid Because Passed in Anticipation of Constitutional Amendment.**

12. Laws of 1921, Chapter 201, in aid of World War veterans, is not invalid because not passed subsequent to or pursuant to Constitution, Article XI–C.

**Constitutional Law—Existing Statute not Void Because not Identified by Constitutional Amendment.**

13. Laws of 1921, Chapter 201, in aid of World War veterans, is not void because not identified by Constitution, Article XI–C for Section 4 of the latter ratifies, adopts, and confirms "any act * * which purports to execute and carry into effect" its provisions, which language includes Chapter 201.

From Multnomah: GEORGE W. STAPLETON, Judge.

In Banc.

The purpose of this suit is to test the validity of an amendment to our state Constitution designated as Article XI-C, and to determine the constitutionality of a statute known as Chapter 201, Laws of 1921. The Circuit Court decided that the amendment was valid, and that the statute was constitutional. The plaintiff appealed.

The questions submitted for decision make it appropriate that the history of Article XI–C and of Chapter 201, Laws of 1921 be given. The history of Article XI–C begins with a resolution, known as House Joint Resolution No. 12, introduced in the House of Representatives at the thirty-first regular session of the legislative assembly which convened on January 10, 1921, and adjourned *sine die* on February 23, 1921, and the story of Chapter 201 commences with the introduction of a bill known as House Bill No. 203 in the House of Representatives at the same session of the legislature.

---

13. On validation of unconstitutional statute by constitutional amendment, see note in 38 L. R. A. (N. S.) 77.

The Constitution (Article XVII, Section 1,) provides that,—

"Any amendment or amendments to this constitution may be proposed in either branch of the legislative assembly, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered in their journals and referred by the secretary of state to the people for their approval or rejection, at the next regular general election, except when the legislative assembly shall order a special election for that purpose. If a majority of the electors voting on any such amendment shall vote in favor thereof, it shall thereby become a part of this constitution. The votes for and against such amendment or amendments, severally, whether proposed by the legislative assembly or by initiative petition, shall be canvassed by the secretary of state in the presence of the governor, and if it shall appear to the governor that the majority of the votes cast at said election on said amendment or amendments, severally, are cast in favor thereof, it shall be his duty forthwith after such canvas, by his proclamation, to declare the said amendment or amendments, severally, having received said majority of votes to have been adopted by the people of Oregon as part of the constitution thereof, and the same shall be in effect as a part of the constitution from the date of such proclamation. * * "

Acting under the authority of Article XVII, Section 1, of the Constitution a joint resolution, as shown by the house journal, was introduced in the house on January 28th "by Messrs. Leonard, Johnson, Hammond, Marsh, North, Wells and Korell (members of the house) in conjunction with Senators Bell and Norblad." In the house journal immediately after the entry reciting the introduction of the resolution is inserted a printed copy of the resolution as in-

troduced. The resolution was duly numbered and thenceforth was known as House Joint Resolution No. 12. The resolution was referred to the committee on resolutions. On February 2d, the committee on resolutions reported H. J. R. No. 12 back without recommendation. The report of the committee was adopted; but the resolution was "re-referred" to the committee on military affairs. On February 10th the committee on military affairs reported the resolution back to the house with a recommendation that it pass with thirteen proposed amendments. The report of the committee is signed by George W. Joseph, chairman of the Senate committee on military affairs, and by W. C. North, chairman of the House committee on military affairs, thus indicating that the two committees had met in joint session. The report of the committee is inserted in the house journal. The report was adopted on motion of Korell, a member of the house. On February 11th, H. J. R. No. 12 was made a special order "for 10:30 A. M. to-day to be considered with H. B. 203." On the same day H. J. R. No. 12 "was read third time" and adopted by a vote of fifty-five yeas and no nays, one having been excused and four being absent.

The senate journal shows that on February 11th, a message was received from the house saying "that the house has passed H. J. R. No. 12 and herewith transmit same for consideration of the senate." Inserted in the senate journal immediately after the entry reciting the receipt of the message from the house is a printed copy of H. J. R. No. 12 as originally introduced in the house, and immediately after the printed copy of the resolution so inserted is an entry stating "the resolution was referred to the

committee on military affairs." On February 12th
the resolution was reported back to the senate by the
committee on military affairs with the recommendation
"that it do pass." The report of the committee was
adopted and "on motion of Senator Joseph H. J. R.
No. 12 was laid on table to be considered with H. B.
No. 203." The senate journal shows that the after-
noon session began at 2 P. M. and "special order at
2:30 o'clock P. M. for consideration of House Joint
Resolution No. 12." On motion of Senator Joseph
H. J. R. No. 12 was taken from the table and the
senate resolved itself into a committee of the whole
"for the consideration of H. J. R. No. 12." The com-
mittee of the whole house arose and reported H. J. R.
No. 12 back to the senate with the recommendation
"that it do pass." The report of the committee was
on motion adopted; and "on the adoption of House
Joint Resolution No. 12 the roll was called and the
vote was" 28 yeas and two nays; and so H. J. R.
No. 12 was declared adopted.

The house journal shows that on February 16th
during the afternoon session a message was received
from the Senate stating "that the senate has passed
H. J. R. No. 12 and herewith transmit same for en-
rollment." On the same date, February 16th, the
house journal shows that "the speaker announced that
he was about to sign H. J. R. No. 12, and subsequently
that he had signed the same."

The senate journal under date of February 17th
shows that the senate received a message from the
house stating that the speaker "has signed H. J. R.
No. 12 and herewith transmit the same for your signa-
ture," and immediately following is an entry stating
that "the President announced that he was about to

sign H. J. R. No. 12 and subsequently that he had signed the same."

Epitomizing the history of H. J. R. No. 12 as recited in the house and senate journals, it may be said that the resolution was introduced in the house, amended by the house, and then adopted as amended. The resolution as originally introduced was printed, and a printed copy of the resolution was inserted in the house journal. The report of the house committee on military affairs, signed by the chairman of the senate committee on military affairs and by the chairman of the house committee on military affairs, is inserted in the house journal; so it can be said that the resolution as originally introduced and the amendments proposed by the committee and adopted by the house were entered at length in the house journal. The resolution, after its adoption by the house, was transmitted to the senate. A printed copy of the resolution as originally introduced in the house is inserted in the senate journal; so that it can be said that the resolution as originally introduced in the house is entered at length in the senate journal; but the amendments adopted by the house are not entered at length in the senate journal. However, there is no affirmative statement found in the senate journal that the printed copy of House Joint Resolution No. 12 is a copy of the resolution received from the house, although the presence of the printed copy in the senate journal, standing alone and not considered in connection with any other facts or circumstances raises an implication that the printed copy inserted in the journal is a copy of the resolution as it was received from the house. The senate journal further shows that the resolution, after its receipt from the house,

was referred to the senate committee on military affairs and that subsequently the senate adopted the report of this committee recommending its adoption. The resolution was also considered by the committee of the whole house and then adopted by the senate, after which it was transmitted to the house "for enrollment." The resolution was enrolled, and the presiding officers of the two branches of the legislative assembly signed the enrolled resolution, and thereupon it was filed with the secretary of state. The legislative assembly completely performed its functions when the enrolled resolution, after having been signed by the speaker of the house and the President of the senate, was delivered to the Secretary of State; and hence the journals of the legislative assembly contain no entries concerning the resolution subsequent to the entries relating to the signatures of the presiding officers.

The proposed amendment as it appeared in its enrolled form was legally submitted to the people at an election held on June 7, 1921, when it was approved by the legal voters of the state, 88,219 votes having been cast for the amendment and 37,866 votes having been cast against it. On June 21, 1921, the Secretary of State, in the presence of the Governor, canvassed the votes as required by law and made and filed a certificate evidencing such canvass. On the same day, June 21, 1921, the Governor issued a proclamation reciting the result of the election as shown by the canvass made by the Secretary of State, and declaring that the "constitutional amendment hereinbefore mentioned shall be and now is in full force and effect as a portion of the Constitution of the State of Oregon."

House Joint Resolution No. 12 as enrolled and filed with the Secretary of State reads as follows:

"Resolved by the House of Representatives of the State of Oregon, the Senate jointly concurring:

"That the constitution of the state of Oregon ·shall be, and the same hereby is, amended by adding thereto an article to be numbered and known as article XI-C, to read as follows:

## "ARTICLE XI-C.

"Section 1. Notwithstanding the limitations contained in section 7 of article XI of the constitution, the credit of the state of Oregon may be loaned and indebtedness incurred to an amount not exceeding 3 per cent of the assessed valuation of all the property in the state for the purpose of creating a fund to be loaned or to be paid to residents of the state of Oregon who served in the army, navy or marine corps of the United States between April 6, 1917, and November 11, 1918, and were honorably discharged from service, which fund shall be known as the 'world war veterans' state aid fund.'

"Bonds of the state of Oregon containing a direct promise on behalf of the state to pay the face value thereof with interest therein provided for, may be issued to an amount authorized in section 1 hereof for the purpose of creating said world war veterans' state aid fund. Said bonds shall be a direct obligation of the state and shall be in such form and shall run for such periods of time and bear such rates of interest as shall be provided for by statute. No person shall be eligible to receive money from said fund except the following:

"Any male or female who ·was enlisted, inducted, warranted or commissioned after June 3, 1915, and who has served honorably in active duty in the army, navy or marine service of the United States at any time between the sixth day of April, 1917, and the eleventh day of November, 1918, and who at the time of entering into such service was a resident of the state of Oregon and who has been honorably sepa-

rated or discharged from said service or has been furloughed to a reserve, shall be entitled to receive from the proceeds of such bonds as a cash bonus the sum of $15 for each month or major fraction thereof that such person was in active service between the sixth day of April, 1917, and the eleventh day of November, 1919, not exceeding a total of $500, or shall be entitled to borrow from said funds not to exceed $4,000, which loan shall be secured by a mortgage upon real estate in an amount not exceeding 75 per cent of the appraised value of said estate, but which loan may be reduced by statute. The legislative assembly may provide that the bonus to which any deceased person would have been entitled hereunder, had he or she lived, shall be paid to any relative of such deceased person.

"Section 2. There shall be levied each year, at the same time and in the same manner that other taxes are levied, a tax upon all property in the state of Oregon not exempt from taxation, not to exceed 2 mills on each dollar valuation, to provide for the payment of principal and interest of the bonds authorized to be issued by this amendment. The 2 mills additional tax herein provided for is hereby specifically authorized and shall not be computed as a part of the revenue raised by taxation which is subject to the tax limitation of section 11, article XI of the constitution of the state of Oregon, and said tax levy hereby authorized shall be in addition to all other taxes which may be levied according to law.

"Section 3. The provisions of the constitution in conflict with this amendment are hereby repealed so far as they conflict herewith.

"Section 4. Any act which has been passed by the legislative assembly and which purports to execute and carry into effect the provisions of this section shall be deemed to have been passed pursuant to and in accordance herewith and is hereby ratified, adopted and confirmed the same as if enacted after the adoption of this section.

"*Be it Further Resolved,* That said proposed amendment be submitted to the people for their approval or rejection at the next election held throughout the state of Oregon whether the same be a general or a special election; be it further

"*Resolved,* That the secretary of state be, and he is hereby authorized and directed to set aside four pages in the official pamphlet containing initiative and referendum measures to be voted on at the next election, whether the same be a general election or a special election, in which arguments supporting the foregoing amendment may be printed, and that a joint committee consisting of two senators and three representatives be appointed to prepare such arguments for publication and file the same with the secretary of state.

"Adopted by the senate February 16th, 1921.

"Roy W. Ritner,

"President of the Senate.

"Adopted by the House February 11th, 1921.

"Louis E. Bean,

"Speaker of the House."

We now direct attention to House Bill No. 203. This bill was introduced in the House of Representatives and read the first time on January 28th, and on January 31st it was read the second time and referred to the committee on ways and means; but subsequently on February 9th, the bill was referred to the committee on military affairs. On February 10th, the committee on military affairs reported the bill back to the house with the recommendation that "it do pass, with the following amendments"; and then followed twelve proposed amendments. The report of the committee was adopted; and on February 11th, the bill was read the third time and passed, fifty-eight members of the house voting for it and none voting against it, one member having been excused and one member being absent.

102 Or.—22

The senate journal shows that on February 11th, the chief clerk of the house sent a message to the senate informing that body that the house had passed House Bill No. 203 "and herewith transmit same for consideration of the senate"; and on the same day the bill was read in the senate the first time. On February 14th, the bill was read the second time and referred to the committee on military affairs. On February 16th, the committee on military affairs reported the bill back to the senate with a recommendation that it be passed with certain proposed amendments. The report of the committee was adopted. On the same day the senate resolved itself into a committee of the whole house for the consideration of House Bill No. 203. The committee of the whole house arose and reported the bill back to the senate with the recommendation that it pass and the senate adopted the report of the committee of the whole house. The rules were duly suspended; and immediately after the entry relating to the suspension of the rules, the senate journal contains the following entry: "Senator Joseph asked unanimous consent to strike out the last section of the bill—being Section 26 of said bill. The request was granted." The bill was then read the third time and was passed by the senate, with twenty-eight members voting yea and two voting nay.

The house journal states that on February 16th, the house received a message from the senate stating that the senate had passed House Bill 203 "with the following amendments"; and then follows a copy of the amendments which had been reported back to the senate by the senate committee on military affairs and adopted by the senate. The next entry in the

house journal reads thus: "House Bill 203 house concurred in senate amend. on motion of Korell." There is no entry affirmatively showing that the vote on the motion to concur was taken by yeas and nays; nor is there an affirmative declaration that a constitutional majority voted for concurrence. In short, there is no entry in the house journal concerning the concurrence by the house except the entry which we have quoted in full.

In the senate journal under date of February 16th is an entry reciting that the senate was in receipt of a message from the house informing the senate that "the house has concurred in senate amendments to House Bill 203."

This house bill as amended in the senate and concurred in by the house was at once enrolled and the enrolled bill was signed by the speaker of the house on February 17th, and subsequently on February 21st it was signed by the President of the senate. On February 21st it was signed by the Governor, and on February 23d it was filed with the Secretary of State. There are, of course, no entries in the legislative journals concerning the bill after the enrolled bill was approved by the Governor and delivered to the Secretary of State. The bill was in due time published and appears as Chapter 201, L. 1921.

Chapter 201 (Laws 1921, p. 359) is entitled "An act to provide for the industrial rehabilitation of all persons and certain dependents of deceased persons, who served in the world war between the United States and the German empire and its allies and to provide for loans or cash bonus; prescribing qualifications of those who shall receive such loan or bonus; fixing the amount of such loan or bonus and creating a commission to be known as 'world war veterans' state aid commission,' and fixing the powers

and duties of said commission; authorizing the issuance and prescribing the character and amount of bonds to be issued, and creating a special fund from the proceeds thereof to carry out the purpose of this act; creating a sinking fund for the retirement of said bonds; authorizing a tax levy for said sinking fund; providing for the appointment of appraisers and attorneys; authorizing said commission to adopt administrative rules and regulations and making an appropriation to cover administration expense."

The act opens with a preamble. Twenty-six separate sections compose the body of the act. Section 1 declares that the state shall pay to each person qualified by the act a cash bonus or shall lend a sum of money in the amount and on the conditions specified by the act. Sections 2, 3, 4 and 5 provide that no person shall receive both a state and a federal bonus, declares that every person who was in the military or naval service of the United States between April 6, 1917, and November 11, 1918, "and who served for a period longer than sixty days and who at the time of entering into such service was a resident of the State of Oregon" shall be entitled to receive a loan or bonus, and specifies the relative or relatives of deceased persons to whom will be paid cash bonuses. Sections 6, 7 and 8 provide that applications for a bonus shall be made within one year after the act becomes of force, makes the bonus or loan optional with the persons entitled to receive, and requires persons who have received the benefits under the act providing for state financial aid to make a refund to the state before they are entitled to receive a loan or bonus under this act. Section 9 provides that the bonus paid to any one person shall not exceed $500 in amount. Section 10 declares that

not more than $3,000 shall be loaned to any one person and prescribes the conditions upon which the money shall be loaned. Section 11 fixes limitations on the sale of property mortgaged to secure a loan. Section 12 provides for the creation of a commission to administer the act to be known as the "world war veterans' state aid commission," which is to be composed of the Governor, Secretary of State, Adjutant-general and two others to be appointed by the Governor. Section 13 authorizes the commission to administer the act. Section 14 empowers the commission to sell bonds and reads as follows:

"The commission is hereby authorized, empowered and directed to sell the bonds of the State of Oregon which may be authorized by the constitution of the state to raise money to meet the requirements of this act, as hereinafter provided."

Section 15 provides for the forms of the bonds "to be sold in order to provide funds for the carrying out the purposes of this act," and for the execution of the bonds, payment of interest and maturity of bonds. Section 16 relates to the advertisement of each issue of bonds before sale. Under Section 17 the moneys arising from the sale of bonds shall be deposited with the state treasurer to the credit of a special fund which shall be used to carry into effect the provision of the act. Section 18 creates a sinking fund to provide for the payment of the principal and interest of the bonds. Such sinking fund consists of all moneys received as payments on principal and interest of loans made to veterans under the act and of all moneys derived from "tax levies as hereinafter provided." Section 19 commands the state tax commission each year at the time it determines the

amount of tax to be levied against each county for state purposes to make a state levy against all taxable property in each county in an amount, in addition to other state taxes, equal to one mill on each dollar of assessable property within the county; and all moneys collected on such taxes shall be credited to the sinking fund created by Section 18. Section 20 confers upon the commission authority to do any act necessary to meet the requirements of the statute. Section 21 authorizes the commission to appoint a board of three appraisers for each county who shall appraise the property upon which loans may be made. The commission is also authorized to appoint attorneys. Section 22 empowers the commission to promulgate a rule for making advances for improvements made on mortgaged premises. Section 23 declares that—

"If any section, subdivision, sentence or clause in this act shall be declared invalid or unconstitutional, such decision shall not affect the validity or meaning of any other portion of this act."

Section 24 appropriates "from any moneys in the general fund not otherwise appropriated the sum of $30,000 to cover the administrative expenses of this act."

Section 25 reads as follows:

"Whereas the legislative assembly of the State of Oregon has submitted to the people of the State of Oregon a constitutional amendment to be known as 'Article XI-C' of the Constitution of the State of Oregon, providing for the issuance of bonds of the State of Oregon not exceeding 3 per cent of the assessed valuation of all property in the state for the purpose of creating a fund to be used in the industrial rehabilitation of world war veterans by providing a bonus or loan to such veterans and also spe-

cifically authorizing a special tax levy not to exceed 2 mills upon each dollar of valuation of all taxable property within the state to provide for the payment of the principal and interest of such bonds, which tax levy shall not be computed in the revenue raised by taxation, which is subject to the tax limitation of Section 11, Article XI of the Constitution of the State of Oregon; and whereas it is necessary to provide by statute for the issuance of said bonds and for the application of the proceeds thereof and for the levying of such tax; therefore, upon the adoption of said constitutional amendment by the people this act shall apply to and regulate the issue of said bonds and the levy of such tax and the application of the proceeds thereof.''

Section 26 reads thus:

''The Secretary of State is hereby authorized and directed to set aside, for an affirmative argument on this act or measure, two pages of the official pamphlet containing proposed initiative and referendum measures to be voted upon at the election at which this act is submitted. A committee consisting of two senators and three representatives to be appointed by the President of the Senate and Speaker of the House, respectively, shall be named to prepare and file with the Secretary of State such affirmative argument.''

This suit is prosecuted by Thomas Henry Boyd, a citizen and taxpayer, against Ben W. Olcott, the Governor of the state, and other officers constituting the state tax commission, and against the Governor and other officers and persons who compose the World War veterans' state aid commission. In the complaint it is alleged that Article XI–C is void because the resolution was not entered in the senate journal, and because the resolution adopted by the senate was not the same resolution which was adopted by the house. It is averred in the complaint that

Chapter 201 is unconstitutional because: (1) The amendments adopted by the senate were not concurred in by the house by a vote upon which the yeas and nays were taken; (2) Section 26 contains statements which indicate the intention of the legislature to refer the act to the people; and (3) the purported ratification or validation of Chapter 201 of Article XI–C is not sufficient to accomplish a validation or ratification, for the reason that Chapter 201 is not identified by Article XI–C and was not passed subsequent or pursuant to "said amendment in the manner provided by the Constitution."

It is further alleged in the complaint that under Article XI–C and Chapter 201 the World War veterans' state aid commission has already received applications for loans exceeding $10,000,000, and that the commission will unless restrained sell bonds intended to be authorized by Article XI–C and Chapter 201 and from the proceeds pay cash bonuses and make loans; and that, unless restrained, the state tax commission will levy an additional tax upon the property of the plaintiff. The prayer of the complaint is that Article XI–C and Chapter 201 be adjudged void, and that the defendants be enjoined from selling bonds or levying taxes under Chapter 201.

The answer in effect declares that Article XI–C was adopted by the legislative assembly in full compliance with the constitution, and that Chapter 201 was constitutionally enacted. The answer sets out in full the entries appearing in both the house and senate journals relating to H. J. R. No. 12 from the time of its introduction in the house until the enrolled resolution was transmitted to the Secretary of State for filing. The answer contains a complete copy of H. J. R. No. 12 as it appears in its engrossed

form filed with the Secretary of State. The indorsements appearing on the back of the engrossed resolution are likewise pleaded in full. The defendants have further set out in their answer a transcript of the resolution as it appears in its enrolled form.

The answer sets out all the entries in the house and senate journals relating to H. B. 203 from the time of its introduction in the house to the time when the house received a message announcing that the Governor had approved and signed the bill. The answer also contains a complete copy of H. B. 203 as it appears in its engrossed form filed with the Secretary of State. The indorsements appearing on the back of the engrossed bill are pleaded in full. A transcript of the enrolled bill is also found in the answer.

The answer recites that Article XI–C was submitted to the people for their approval or rejection at a special election held on June 7, 1921, and that it was approved by the people. The result of the vote as shown by the canvass made by the Secretary of State is given; and a complete copy of the proclamation issued by the Governor is pleaded.

The plaintiff demurred to the answer upon the ground that it failed to state sufficient facts to constitute a defense. The Circuit Court overruled the demurrer; and, upon the refusal of the plaintiff to plead further, the court entered a decree dismissing the complaint "with prejudice."        AFFIRMED.

For appellant there was a brief over the names of *Mr. Franklin F. Korell* and *Mr. Jerry E. Bronaugh,* with an oral argument by *Mr. Korell.*

For respondents there was a brief over the names of *Mr. I. H. Van Winkle,* Attorney General, and *Mr.*

*Willis S. Moore,* Assistant Attorney General, with an oral argument by *Mr. Moore.*

*Mr. Stanley Myers* and *Mr. Maurice Crumpacker,* for "American Legion, Department of the State of Oregon," *Amici Curiae.*

HARRIS, J.—1. The plaintiff argues that Article XI–C is void because it was not adopted in full compliance with the Constitution; and that Chapter 201 is likewise void because it was not enacted by the legislative assembly in full compliance with the Constitution. At the very outset the defendants contend that the court cannot inquire whether Article XI–C was regularly adopted by the legislative assembly or approved by the people, because it involves a political and not a judicial question. If, however, it is held that the inquiry involves a judicial question and that therefore the court may legally investigate and determine whether Article XI–C has been constitutionally adopted by the legislative assembly and approved by the people, the defendants nevertheless contend that the court must accept the enrolled resolution filed with the Secretary of State as an absolute verity and as a conclusive presumption that all the steps required for its lawful existence were taken in full compliance with the Constitution. The defendants also seek to apply the same argument to Chapter 201, and they are insisting that the enrolled H. B. 203 is conclusive evidence that all that was required by the Constitution to be done was done, and that the resolution was regularly and legally enacted by the legislative assembly and approved by the Governor and filed with the Secretary of State. If the question of the regularity of the

adoption of the amendment is a political and not a judicial question, then Article XI-C must be treated as having been legally adopted, and in that event the inquiry cannot proceed further than the inspection of the enrolled resolution filed with the Secretary of State.  If the resolution and enrolled bill, duly authenticated and filed with the proper officers as they are, must be accepted as absolute verities which conclusively import regularity, then further inquiry is prevented and in that event the decree must be affirmed.  If, however, it should be determined that an enrolled resolution is not an absolute verity, nevertheless Article XI-C must be held valid if it should be further determined that the Governor is given exclusive authority to decide whether an amendment to the Constitution has been regularly adopted; for the defendants here argue that the Governor is given exclusive power to decide whether the Constitution is legally amended and that consequently his proclamation is conclusive upon the court.

It must be remembered that the question involved here is not whether a new Constitution has been adopted, nor whether an amendment to the Constitution is such as to preserve the republican form of our government; and consequently precedents like *Luther* v. *Borden,* 7 How. 1 (12 L. Ed. 581), and *Pacific States Tel. & Tel. Co.* v. *Oregon,* 223 U. S. 118 (56 L. Ed. 377, 32 Sup. Ct. Rep. 224), are not in point.  The question presented by the record is whether Article XI-C was proposed, adopted and ratified as an amendment to the Constitution in the manner and form and in accordance with the procedure prescribed by the Constitution.  Stated broadly, and subject to whatever rules of evidence may be applicable, such a question is in this jurisdic-

tion, as it is in other jurisdictions, a question for the courts to determine, unless committed by the constitution to a special tribunal with power to make a conclusive decision: *McConaughy* v. *Secretary of State,* 106 Minn. 392, 417 (119 N. W. 408); 12 C. J. 880; 6 R. C. L. 32. The conclusion that the question last mentioned is a judicial question was reached in *Kadderly* v. *Portland,* 44 Or. 118, 131 (74 Pac. 710, 75 Pac. 222), where this court expressed its views through a then member of the court who is distinguished for his learning and wisdom; and so on the faith of *Kadderly* v. *Portland,* it may be accepted as an established doctrine in this jurisdiction that the courts are empowered to investigate and determine whether an amendment to our Constitution has been legally adopted by the legislature and approved by the people, unless the power to investigate and decide is lodged elsewhere by the express terms of the Constitution.

There is a difference of judicial opinion concerning the effect to be given to an enrolled bill or resolution when it has been authenticated and is found in the custody of the proper officer. Some courts treat an enrolled bill as an absolute verity and will not look beyond the enrolled bill to the legislative journals or to other evidence to ascertain whether the bill has been regularly enacted. This view is frequently mentioned as the enrolled bill rule. It has always been the rule in England. The Supreme Court of the United States has adopted the enrolled bill rule. The current of judicial opinion has been steadily turning towards this rule during the last decade, for in nearly every jurisdiction where the question has, within the last ten years, presented itself as one of first impression, the courts have adopted the

enrolled bill rule. Some courts have adhered to the journal entry rule only because fettered by their own precedents. Other courts have repudiated their own precedents, have receded from the journal entry rule and have adopted the enrolled bill rule. The following are some of the precedents approving the enrolled bill rule: *Field* v. *Clarke*, 143 U. S. 649 (36 L. Ed. 294, 12 Sup. Ct. Rep. 495); *Louisiana State Lottery Co.* v. *Richoux*, 23 La. Ann. 743 (8 Am. Rep. 602); *State ex rel. Reed* v. *Jones*, 6 Wash. 473 (34 Pac. 201, 23 L. R. A. 340); *Carr* v. *Coke*, 116 N. C. 223 (22 S. E. 16, 47 Am. St. Rep. 801, 28 L. R. A. 737); *Ex parte Wren*, 63 Miss. 512 (56 Am. Rep. 823); *State ex rel. Pangborn* v. *Young*, 32 N. J. L. 29; *Williams* v. *Taylor*, 83 Tex. 667 (19 S. W. 156); *Allen* v. *State*, 14 Ariz. 458 (130 Pac. 1114, 44 L. R. A. (N. S.) 468). See, also, *Gottstein* v. *Lister*, 88 Wash. 462 (153 Pac. 595, Ann. Cas. 1917D, 1008, 1021); 1 Sutherland, Stat. Constr. (2 ed. by Lewis) 72; *Atchison, T. & S. F. R. Co.* v. *State*, 28 Okl. 94 (113 Pac. 921, 40 L. R. A. (N. S.) 1, and note); 25 R. C. L. 895.

Other courts have adopted the view that an enrolled bill is only *prima facie* evidence of regularity, and, therefore, hold that it is proper to look to the legislative journals to ascertain whether the bill has been passed in compliance with the constitutional requirements. This view is sometimes called the journal entry rule: 35 R. C. L. 395, 399. This court has in prior decisions approved and followed the journal entry rule: *Currie* v. *Southern Pacific Co.*, 21 Or. 566, 570 (28 Pac. 884); *State* v. *Rogers*, 22 Or. 348, 364 (30 Pac. 74); *McKinnon* v. *Cotner*, 30 Or. 588, 591 (49 Pac. 956); *Portland* v. *Yick*, 44 Or. 439, 442

(75 Pac. 706, 102 Am. St. Rep. 633).   See, also, 26 R. C. L. 898.

In the final analysis both rules are, within the meaning of our Code, rules of evidence: Sections 637, 696, and 699, Or. L.   The enrolled bill rule involves a conclusive presumption of regularity, and consequently is a rule of evidence in the same sense that Section 798, Or. L., treating of conclusive presumptions, is a rule of evidence.   See, also, Section 669, Or. L.   The journal entry rule involves a disputable presumption, and consequently is likewise a rule of evidence in the same sense that Section 799, Or. L., treating of disputable presumptions, is a rule of evidence.   In jurisdictions where the enrolled bill doctrine is followed, the enrolled bill always prevails over the journal entry, for the latter cannot be used to impeach the former.   In jurisdictions where the journal entry rule is followed, the journals are permitted to prevail over the enrolled bill, for the former may be used to impeach the latter.   Under one rule the enrolled bill is always of supreme authority; under the other rule the legislative journals may be of supreme authority.

If the comparative values of these two rules of evidence are to be measured by the reasons which are usually advanced for their support, it will be found that the reasons given in support of the enrolled bill rule are not only greater in number but also more persuasive in quality than those given in support of the journal entry rule.   It is true that the Constitution (Article IV, Section 13) requires each house to keep a journal of its proceedings, but it is also true that the Constitution contemplates that every bill and every joint resolution shall be evidenced by an authenticated writing which in legisla-

tive parlance is usually known as the enrolled bill
or resolution, and, moreover, the Constitution (Ar-
ticle IV, Section 25) in express terms commands that
"all bills and joint resolutions so passed shall be
signed by the presiding officers of the respective
houses"; so that it cannot be said that the Consti-
tution alone and of itself either expressly or im-
pliedly dignifies the journals with a higher rank than
is accorded to the enrolled bill. Considerations of
public policy argue strongly in favor of the enrolled
bill rule: 22 C. J. 83. This rule is a rule of greater
certainty and that circumstance is not without influ-
ence. There are additional reasons arising out of
statutes in force in this state and out of legislative
practices prevailing here. The journal of each house
is prepared and kept by clerks chosen by the mem-
bers of the house. No member of the legislature
keeps the journal, and only in rare instances does
any member of the legislature ever see or read any
part of the journal before the final adjournment of
the legislature. Any person who within the last
quarter of a century has served in the Oregon legis-
lature knows that the journals are not read in open
session for approval or correction by either house.
In the House of Representatives, as shown by the
journal for the session of 1921 as well as by prior
journals, the practice is and for many years has been
by motion each day to dispense with the reading of
the journal. As shown by the senate journals, it is
not and has not been the practice of the senate to
read the journal at any time during the session.
Even with the most competent clerks the journal
cannot be kept with absolute accuracy and in perfect
order from day to day so that upon the moment of
final adjournment the journals can be delivered to

the Secretary of State without further attention or correction. The legislature long ago took notice of the condition in which the journals invariably are at the time of final adjournment, and recognized the necessity of correcting and completing the journals after the final adjournment of the legislative assembly; for it is by statute made "the duty of the chief clerk and calendar clerk of each house to remain at the capital after the adjournment of a session of the legislature, and correct and complete the journals of the respective houses, and for this service they shall be allowed compensation for a number of days equal to one-third of the number of days which the session continued, at the rate per day provided for in this chapter." Section 2689, Or. L.

No officers or persons except the chief and calendar clerks are required to examine the journals subsequent to final adjournment. It would be quite extraordinary to find that any member of the legislature had examined the journals after adjournment and before delivery to the Secretary of State.

The chief clerk of the senate and the chief clerk of the house must at the close of each session of the legislature deliver the journals to the Secretary of State, for under the terms of Section 2714, Or. L., it is made the duty of these two clerks to deposit for safekeeping in the office of the Secretary of State "all books, bills, documents, and papers in the possession of the legislature, correctly labeled, folded, and classified." The clerks are furnished with printed blanks, and these blanks are used in keeping a record of the proceedings in the house. These sheets of paper are kept separately and are not bound until after final adjournment. In actual practice, matter written and printed on these sheets

is never read by or to either house in open session; and hence the journals delivered to the Secretary of State are journals which have been kept by clerks, and not by the members themselves; they have not been read in their entirety by any member of the legislature, although there may be rare instances where some part of the journal has been read by some member; they have been corrected and completed after the final adjournment of the session and after the members of the assembly have gone to their respective homes. When the journals are delivered to the Secretary of State he is required to exercise only the same degree of care in providing for their safekeeping as is required of him in the care of other books and papers delivered to him in the routine of business; but he is not commanded to exercise that degree of extraordinary vigilance which is by statute required of him in safekeeping an enrolled bill. Of course it may be said that the presumption is that the clerks perform their duties and correctly keep the journals, but the same presumption of official duty correctly performed applies to every clerk and to every member of the assembly having any duty to perform in connection with an enrolled bill. It may be said, too, that the members of each house are responsible for the accuracy of the journal of that house; but it can be said with equal force that the members of the legislature are responsible for the accuracy and truth of an enrolled bill. It must be remembered that we are now examining the actual conditions out of which spring reasons for a rule of evidence, and that the strength or weakness of the reasons depends in a large measure upon the conditions as they actually exist.

102 Or.—23

A committee on enrolled bills is appointed from the membership of each house. When a bill has been passed by both houses or a joint resolution has been adopted by both branches of the legislative assembly, the engrossed bill or engrossed resolution is delivered to the chairman of the committee on enrolled bills appointed from the house where the bill or resolution originated, and it is the duty of that committee to draft what is termed the enrolled bill or resolution which subsequently is presented to the speaker of the house and to the President of the senate for their signatures. The presiding officers always sign enrolled bills and enrolled resolutions in open session. The presiding officer always announces that he is about to sign a given bill or resolution; he signs it; and then he formally announces that he has signed it. No other business can be transacted while the presiding officer is signing an enrolled bill or resolution. After the enrolled bill is signed by the presiding officer of the two houses it is delivered to the Governor and if approved by him is filed with the Secretary of State. By the terms of Section 2707, Or. L., the Secretary of State is

"charged with the safekeeping of all enrolled laws and resolutions, and shall not permit the same or any of them to be taken out of his office or inspected, except in his presence, unless by order of the Governor, or by resolution of one or both houses of the legislature, under penalty of $100."

We direct attention to Section 2715, Or. L., and especially to the clauses which we have caused to be italicized,—

"It shall be the duty of the Secretary of State to cause the original enrolled laws and joint resolutions,

passed at each session of the legislature, to be bound in a volume, in a substantial manner, and in the order in which they are approved, *and no further record of the official acts of the legislature, so far as relates to acts and joint resolutions, shall be required of said secretary,* and he shall index the same, and cause the title thereof, with the session at which the same shall have been passed, to be written or printed on the back of such volume.''

Section 2715 must be read in the light of the statute which requires the Secretary of State to furnish to the state printing board true and correct copies of all laws enacted by the legislative assembly together with copies of resolutions. The enrolled bills and enrolled joint resolutions are the originals from which the Secretary of State prepares his copies for the state printing board, and these copies are the copies from which the session laws are printed. It must also be remembered that Section 2715, Or. L., was enacted in 1859 by a legislative assembly which included among its members some of the men, three in the senate and five in the house, who had been members of the convention that drafted our state Constitution.

So far as presumptions are concerned there is not a single presumption attaching to the legislative journals that does not logically and with equal or greater force also attach to every enrolled bill and joint resolution. The enrolled bills and joint resolutions must, by the express command of the statute, be guarded by the Secretary of State with extraordinary care and ceaseless vigilance. Journals are guarded with merely the same degree of care as is required in case of ordinary papers filed from day to day. What may happen as a result of the mere handling of the journals may be illustrated by an actual experience.

The members of this court were examining the original journals and while doing so a printed copy of a measure, which had been loosely inserted in one of the journals, fell out. It can be readily understood that the mere handling of the journals could easily cause the loss of any sheet that may have been loosely and hastily inserted, and if that sheet contained an entry mandatorily required by the Constitution the loss of the sheet would under the journal entry rule invalidate the statute to which the entry related even though every step required by the Constitution had been actually taken and despite the fact that the measure had received a constitutional majority in both houses, and, if referred to the people, had received an overwhelming majority 'at the polls. Although it is possible for a mistake to occur during the progress of a bill through the two houses and for the bill to be signed and filed as an enrolled bill notwithstanding that mistake, yet it is also possible for a mistake to occur in the journals, either by way of omission or commission, notwithstanding the fact that a bill has in truth passed both houses in strict accordance with the requirements of the Constitution. Every step required by the Constitution is taken in open session and in the presence and hearing of the members in attendance. Nearly every measure has its foes as well as its friends and, consequently, is constantly under the eyes of those who oppose as well as those who favor it. A calendar is prepared, corrected and printed nearly every day, if not every day, showing the status of every measure introduced, and this printed calendar is laid upon the desk of every member of the assembly. The chances of any measure reaching the stage of an enrolled bill in spite of failure

of either house to do some act required by the Constitution are at least as few, if not fewer, than the chances of failure to make some entry which ought to have been made in the journal. Possibility of error in the journal is just as great, if not greater, than the possibility of error in the course taken by an enrolled bill or joint resolution.

We have taken this occasion to point out the difference between the two rules and to direct attention to the possible result of adherence to the journal entry rule. As previously explained, we are confronted with prior decisions of this court which have followed the journal entry rule. We do not by anything stated here wish to be understood as receding from or overruling any of those prior decisions. It is not necessary at this time to decide whether this court will in the future continue to adhere to the journal entry rule or will repudiate it and adopt the enrolled bill rule, because in the instant case Article XI–C and Chapter 201 can successfully pass the test of the journal entry rule. We shall therefore assume for the purpose of the instant case that our prior precedents require us to follow the journal entry rule.

2. The Constitution does not confer upon the Governor exclusive authority to pass upon the validity of an amendment voted upon and adopted by the people. Indeed, the duty imposed upon the Governor is a limited one. The votes must be canvassed by the Secretary of State in the presence of the Governor, and "if it shall appear to the Governor that the majority of the votes cast" at the election are in favor of the amendment, it is his duty to issue a proclamation declaring the amendment adopted as a part of the Constitution. The Governor is directed

to make only one inquiry, and that inquiry is: Did a majority of the electors vote for the amendment? If a majority did so vote, the Governor must issue a proclamation as commanded. Clearly the Governor is not given exclusive authority, if any authority at all, to go behind the canvass of the votes and to investigate and to determine whether constitutional and statutory requirements have been fulfilled up to the time of the canvass. The Constitution does not contain any language which, by the remotest intimation or otherwise, indicates an intention to vest the Governor with exclusive authority to determine upon the regularity of the submission of an amendment to the Constitution; and, hence, the proclamation of the Governor cannot give rise to a conclusive presumption of regularity.

3. The Constitution is an instrument which contains the fundamental or basic law to which all other laws must conform. We do not ordinarily expect to find in a Constitution rules which are merely directory; but, upon the contrary, we are accustomed to find and always expect to find within a Constitution nothing but mandatory provisions. As pointedly stated by Judge Cooley,—

"The courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of the Constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised." Cooley, Const. Lim. (7 ed.) 114.

4, 5. The Constitution prescribes the method by which it may be amended, and the procedure so pre-

scribed is the measure of the power to amend. The provisions of the Constitution for its own amendment are mandatory and binding not only upon the legislative assembly but also upon all the people as well; and, consequently, a failure to observe the mandates of the Constitution is fatal to a proposed amendment, even though the electors have with practical unanimity voted for it. *Kadderly* v. *Portland,* 44 Or. 118, 135 (74 Pac. 710, 75 Pac. 222). Of course, as said by Mr. Justice BREWER in *Prohibitory-Amendment Cases,* 24 Kan. 700, 710: "The two important vital elements in any constitutional amendments, are, the required vote of the legislature and a majority of the popular vote." Other provisions are mere machinery and forms. While a liberal interpretation may sometimes be applied to the manner of compliance with constitutional requirements concerning mere forms and machinery, it is unusual to find any reported decision holding that the total omission or disregard of such a requirement is harmless: *Hammond* v. *Clark,* 136 Ga. 313 (71 S. E. 479, 36 L. R. A. (N. S.) 77). So long as the Constitution remains as the fundamental law of the land it and no other law can control unless this becomes a government of men and ceases to be a government of law. We cannot agree with the contention of the defendant that Article XVII is to be treated as merely directory when it declares that a proposed amendment shall be "entered in" the legislative journals. This provision of the Constitution is mandatory; and, therefore, the questions remaining for decision concerning the amendment are: (1) What do the words "entered in" mean as used in Article XVII? And (2) do the journals show a compliance with the requirement?

6, 7. Although the journal entry rule permits the impeachment of an enrolled bill by the legislative journals, yet there are limitations upon the operation of the rule. At the very beginning of every investigation concerning the question of regularity the enrolled bill presents itself behind the shield of a presumption that it has been regularly enacted. This presumption it is true is disputable and may be overcome; but it is also settled that all intendments in favor of regularity will be invoked, and unless it is clear and palpable that the legislature has violated the Constitution, its acts will be sustained: *Kadderly* v. *Portland,* 44 Or. 118, 143 (74 Pac. 710, 75 Pac. 222). Every reasonable presumption is to be made in favor of the regularity of legislative proceedings. If the Constitution does not require a given proceeding to be entered in the journal, the absence of a record in the journal will not invalidate a law. It will not be presumed from the mere silence of the journal that either house has exceeded its authority or disregarded constitutional requirements in the passage of legislative acts: *Currie* v. *Southern Pacific Co.,* 21 Or. 566, 571 (28 Pac. 884); *State* v. *Rogers,* 22 Or. 348, 364 (30 Pac. 74); *Portland* v. *Yick,* 44 Or. 439, 442 (75 Pac. 706, 102 Am. St. Rep. 633); *Emmons* v. *Southern Pacific Co.,* 97 Or. 263, 274 (191 Pac. 333). The language used in *McKinnon* v. *Cotner,* 30 Or. 588, 592 (49 Pac. 956), is peculiarly applicable to H. J. R. 12 and to H. B. 203, and hence we quote from that opinion as follows:

"The enrolled act as filed with the Secretary of State is signed by the officers of the house and senate required by the Constitution to sign all bills and joint resolutions passed by their respective bodies, and is therefore officially attested in the manner re-

quired by the organic law as one that has regularly
and duly passed the legislature, and this attestation
must prevail, unless the contrary conclusively ap-
pears by the journals of their proceedings."

8. It is contended by the plaintiff that the proposed
amendment, Article XI–C, was not "entered in" the
journals as required by Article XVII, Section 1 of
the Constitution. It will be remembered that a
printed copy of H. J. R. 12 as originally introduced
in the house was inserted in the house journal and
that the report of the committee containing amend-
ments which were adopted by the house was also
inserted in the house journal. It is plain, there-
fore, that even though it be assumed that the Con-
stitution requires a proposed amendment to be en-
tered at length in the journals, the requirement is
fulfilled so far as the house journal is concerned.
The senate journal, however, presents a different sit-
uation.

A printed copy of the resolution, as the resolution
appeared when originally introduced in the house,
was inserted in the senate journal by pasting one end
of the printed copy to one of the blank sheets used
in keeping a record of the senate proceedings, and
therefore it can be said that the resolution as origi-
nally introduced is entered at length in the senate
journal; but a copy of the amendments which were
adopted by the house does not appear in the senate
journal, nor does the senate journal contain a copy of
the resolution as amended and passed by the house.
If the Constitution requires the proposed amendment
to the Constitution as it appeared when it passed the
house to be entered at length in both journals, then
the senate journal fails to meet that requirement.
In this connection we repeat that the senate journal

does not contain an affirmative declaration that the printed copy inserted in the senate journal is a copy of the resolution received by the senate from the house, although the insertion of the printed copy of the original resolution does raise the implication that the printed copy is a copy of the resolution upon which the senate acted.

What do the words "entered in" mean? The verb "enter" has many meanings, some of which are:

"To cause to be inscribed or enrolled; offered for admission, reception, or competition: as to enter one's son or one's self at college; to enter a friend's name at a club; to enter a horse for a race; to report at the custom-house, as a vessel on arrival in port, by delivering a manifest; as, to enter a ship or her cargo." Century Dictionary (Revised and Enlarged Edition).

Among the meanings given in Webster's New International Dictionary are the following:

"To inscribe; enroll; record; as, to enter a name or a date, in a book, or a book in a catalogue; to enter the particulars of a sale in an account."

In the Century Dictionary (Revised and Enlarged Edition) we read that the noun "entry" means:

"The act of entering or recording in a book; the act of setting down in writing, as a memorandum; the making of a record. That which is entered or set down in writing; a record, as of a fact, or an item in an account."

When a bookkeeper enters a promissory note in a ledger he does not copy the note in full. When a book is entered in a catalogue the whole book is not reproduced in the catalogue.

When considering a Constitution or a statute, ascertainment of the intention is the "consummation

devoutly to be wished.'' Words found in the instrument are to be interpreted and understood in their most natural and obvious meaning, unless it appears from the subject or the text that they have been used in a technical sense. The presumption is in favor of the natural and popular meaning in which words are understood by the people who have adopted them: Sections 716, 718, Or. L.; 12 C. J. 705.

If a resolution is written out in full in the journal it is of course entered in the journal; and so, too, when the journal contains a record sufficient to identify a given resolution it is entered in the journal within the meaning of the word ''entered'' as that word is naturally and popularly understood; but, nevertheless the authorities are divided upon the question as to whether or not the word ''entered,'' when found standing alone, requires recording in full, *in extenso,* at length, or is satisfied if the journal contains references sufficient for identification: 6 R. C. L. 29. After a careful examination of many authorities discussing the subject it is our conclusion that a great majority of the reported judicial decisions, when read and analyzed in the light of the facts upon which they are based, support the rule that an identifying reference is a full compliance with a constitution requiring that a resolution be ''entered in'' the journal: See 12 C. J. 692; *Ex parte Ming,* 42 Nev. 472 (181 Pac. 319, 6 A. L. R. 1216). The following are a few of the many reported decisions holding that an identifying reference satisfies the requirements of a Constitution worded like our Constitution: *Ex parte Ming,* 42 Nev. 472 (181 Pac. 319, 6 A. L. R. 1216); *Oakland Paving Co.* v. *Tompkins,* 72 Cal. 5 (12 Pac. 801, 1 Am. St. Rep. 17); *Thomason* v. *Ashworth,* 73 Cal. 73 (14 Pac. 615); *Constitutional*

*Prohibitory Amendment,* 24 Kan. 700; *Cudihee* v. *Phelps,* 76 Wash. 314 (136 Pac. 367); *Gottstein* v. *Lister,* 88 Wash. 462 (153 Pac. 595, Ann. Cas. 1917D, 1008); *State ex rel. Adams* v. *Herried,* 10 S. D. 109 (72 N. W. 93); *Worman* v. *Hagan,* 78 Md. 152 (27 Atl. 716, 21 L. R. A. 716); *In re Senate File,* 25 Neb. 864 (41 N. W. 981); *Lee* v. *Price,* 54 Utah, 474 (181 Pac. 948); *West* v. *State,* 50 Fla. 154 (39 South. 412). If our Constitution explained how the proposed amendment should be entered by commanding that it be entered "in full" or "at length," then quite a different situation would be presented: See note in 6 A. L. R. 1230, and *Nesbit* v. *People,* 19 Colo. 441 (36 Pac. 221); *People ex rel. Elder* v. *Sours,* 31 Colo. 369 (74 Pac. 167, 102 Am. St. Rep. 34). Indeed, if the cases are read discriminatingly and with the facts involved constantly kept in mind, it will be found that, after eliminating all precedents dealing with constitutions which expressly require an entry "at length" or "in full," only a very few will remain holding that the word "entered" when standing alone means "entered in full." It is claimed by the plaintiff that *Kadderly* v. *Portland,* 44 Or. 118, 135 (74 Pac. 710, 75 Pac. 222), supports his contention; but as said in *Ex parte Ming,* 42 Nev. 472 (181 Pac. 319, 6 A. L. R. 1216, 1220), the case of *Kadderly* v. *Portland* is no authority sustaining the contention of the plaintiff, for there this court merely stated the result of the holdings in three other jurisdictions and cited three cases, one from each of such three jurisdictions, listed as belonging to the "entered in full" rule. And in this connection it is of interest to note that one of those three cases has since been overruled, and another has since been clearly distinguished by a court which has unmistakably taken its place with

courts which hold that an identifying reference is
sufficient. If, then, we should be guided and gov-
erned entirely by the weight of judicial precedents,
our conclusion would necessarily be that the entry
of a sufficient identifying reference satisfies the re-
quirements of our Constitution. But we do not rest
our conclusion entirely upon the weight of judicial
precedents, for we prefer to base our conclusion
principally upon what we believe to be the better
reasons.

When the Constitution, as a whole, is taken by
its four corners and examined as an entirety, and
Article XVII is read in connection with the remainder
of the instrument, it will become obvious that the
conclusion that the words "entered in" as used in
Article XVII are satisfied when the entry consists of
an identifying reference and that they do not man-
datorily compel an entry in full, is the only conclu-
sion which can be reasonably drawn. Article V, Sec-
tion 15b of the Constitution begins with the following
sentence:

"Every bill which shall have passed the legislative
assembly shall, before it becomes a law, be presented
to the Governor; if he approve, he shall sign it; but
if not, he shall return it with his objections to that
house in which it shall have originated, which house
shall enter the objections at large upon the journal
and proceed to reconsider it."

Article V, Section 15b, still reads exactly as it did
when framed by the constitutional convention and
adopted by the people. The words "such proposed
amendment or amendments shall, with the yeas and
nays thereon, be entered in their journals" of Article
XVII, as now printed in Or. L., p. 184 (Olson's
Comp.), appear exactly the same as they are

printed in Deady's Compilation of 1866, except that
in the latter the word appearing before the word
"their" is "on" and not "in." Thus it is seen that
we have an instrument in which the word "entered"
appears in one section, and the word "enter" in
another. Because of the nature of the instrument
we may fairly assume that every word used in it was
selected with care and after deliberation. In one
section the command is to enter the proposed
amendment without specifying in the order how the
entry shall be made, whether by an identifying ref-
erence or by a complete copy. In the other section,
the command is to enter the objections of the Gov-
ernor, and the section prescribes how the command
shall be executed. By specifically ordering the en-
try to be "at large," is it not fair to assume that
the framers of the Constitution knew that if the
words "at large" were omitted the word "enter"
would be given its popular signification and con-
strued to mean either a full copy or a mere reference
which would be sufficient to identify the objections of
the Governor? Article V was drafted by the com-
mittee on executive department, a committee of seven
members of the constitutional convention, of which
committee J. K. Kelly was chairman. Apparently
Article XVII was prepared by a committee of nine
members of the constitutional convention, known as
the committee on miscellaneous provisions, of which
Reuben P. Boise was chairman; for on page 75 of
the journal of the constitutional convention we read:

"Mr. Williams [George H. Williams] moved to
instruct the Committee on Miscellaneous provisions
to report on the mode of amending the constitution;
which was agreed to."

Article XVII was not even submitted to the convention until after Article V had been read three times, discussed in the committee of the whole, read and debated by clauses, amended and finally passed by the convention; and consequently the language employed in Article XVII was used with full knowledge of the language which had been already adopted in Article V. The fact that J. K. Kelly was the chairman of the committee that prepared the one article, and that Reuben P. Boise was the chairman of the committee that framed the other article affords at least some assurance that the words "at large" were inserted in Article V because deemed essential to secure the entry of a complete copy of the objections of the Governor, and that they were omitted from Article XVII because it was not deemed essential that a full copy of the proposed amendment be entered in the journal. Moreover, two of the members who served on the committee which prepared Article V also served on the committee that prepared Article XVII: Journal of the Constitutional Convention, published in 1882 by W. H. Byars, State Printer, pages 16, 24, 31, 37, 39, 40, 42, 43, 57, 75, 77. After giving to the question our most careful consideration and our best judgment, we are convinced that the words "entered in" were clearly intended to mean any kind of entry which is sufficient to afford identification.

9. It must be conceded that the proposed amendment was "entered in" the house journal; but the principal question yet to be answered is: Was the proposed amendment "entered in" the senate journal? If the printed copy of H. J. R. 12 found in the senate journal were withdrawn from the journal, the remaining references in the senate jour-

nal would be sufficient to prove beyond every reasonable doubt that the resolution adopted by the senate was the resolution as it appeared and existed after it was amended and adopted by the house. In other words, if the printed copy now found in the senate journal had never been inserted, the journal would nevertheless show that the senate adopted H. J. R. 12 in the form in which it was adopted by the house and in the form in which it appears in the enrolled resolution. But the plaintiff argues that since the printed copy of the resolution as originally introduced in the house is in fact in the journal it necessarily shows that the house adopted the resolution in one form and that the senate adopted it in another form; that the house adopted the original resolution with the amendments, and that the senate adopted the original resolution without the amendments.

As previously explained, the senate journal does not contain an affirmative statement that the printed copy is a copy of the resolution as the resolution was received from the house, and hence the senate journal contains only an implied declaration that the printed copy is a copy of the form of the resolution adopted by the senate. We have, then, on the one hand an enrolled resolution fortified with every reasonable presumption in its favor, and as said in *McKinnon* v. *Cotner,* 30 Or. 588, 592 (49 Pac. 956), the enrolled resolution must prevail "unless the contrary conclusively appears by the journals of their proceedings"; and on the other hand we have a journal which contains a mere implied declaration. The conflict then is between a presumption, which can be overcome only when conclusively refuted by the journal, and a mere implication arising out of the journal. In the circumstances presented here it is

entirely manifest that this mere implication arising
out of the journal is not sufficient to outweigh the
presumption attaching to the enrolled resolution; and
it seems to us that there is no room whatever for
any claim that the implication conclusively refutes
the presumption.

When the journal is read in the light of admitted
legislative practice all reasonable doubts, yes even
hypercritical doubts, will be removed. The practice
of our legislative assembly is determined by the Con-
stitution, by statutes, by rules adopted by the as-
sembly and by each house, and by parliamentary
usage. The course taken by bills when introduced
in the house will make plain the point we are now at-
tempting to make. The Constitution requires a bill
to be read three times, but this constitutional require-
ment does not include resolutions. However, the
practice followed in the case of joint resolutions is
substantially the same as the practice followed in
the case of bills.

All bills introduced in the house are known as
house bills; and all bills introduced in the senate are
known as senate bills. When a bill is introduced in
the house it is filed by the chief clerk and is given
a number which becomes ever afterwards a mark of
identification. All bills are numbered consecutively
in the order of their introduction and the same num-
ber is never given to two or more bills. However,
the engrossed bill and the enrolled bill take the same
number as that given to the original bill, and the same
number is of course given to committee reports;
but these papers, the engrossed bill, the enrolled bill
and the committee reports, show on their faces and
by endorsements on the backs that they are such
papers. Each bill then has its own number and no

102 Or.—24

other bill is given that number. The bill is read the first time, generally by title only, and then the paper as originally introduced is delivered to the printer who prints it. A printed copy of the bill is immediately laid upon the desk of every member of each house and the original bill is returned by the printer to the chief clerk of the house. The bill is afterwards read the second time, usually by title only, and then according to house rule 46 the speaker states "it is ready for amendment, commitment or engrossment." In actual practice the bill is almost invariably referred to a committee, usually a standing committee, sometimes to a special committee, and occasionally it goes to a committee of the whole house. If referred to a standing or to a special committee, the original bill is delivered to the chairman of that committee. The committee reports the bill back to the house, and if the committee suggests amendments those amendments are acted upon. Occasionally an amendment is made upon the floor of the house; as, for example, the correction of a clerical mistake, or as where an amendment is made with unanimous consent as illustrated by the request of Senator Joseph to strike out Section 26 of House Bill 203; but ordinarily amendments are suggested by committees and then acted upon by the house at the times when those committees make their reports. The amendments are printed and a printed copy of the amendments is laid upon the desk of every member of each house. If the amendments are adopted the original bill and the report of the committee containing the amendments are delivered to the chairman of the engrossing committee for engrossment. When the bill with its amendments is engrossed, the chairman of the engrossing committee returns to the chief clerk of the

house the original bill and the report of the committee, and also delivers to him the engrossed bill. The engrossed bill is simply an amalgamation of the original bill and the amendments. There are now at this stage of the proceeding three papers in the hands of the chief clerk: the original bill, the report of the committee, and the engrossed bill. At this stage the original bill and the report of the committee containing the amendments have become, so to speak, *functus officio;* and they do not again leave the hands of the chief clerk of the house until after final adjournment. When the bill is read the third time it is the engrossed bill which is read, and if passed by the house the paper called the engrossed bill is the one which is transmitted to the senate. When the bill is read the third time it is read in full. If the bill as originally introduced is not amended in the house, then the original bill, according to the practice in this state, serves as the engrossed bill and is the paper which is transmitted to the senate. The engrossed bill, after receipt by the senate, is read the first and second times by title and then is referred and delivered to a committee. The paper called the engrossed bill is then returned to the senate by the committee with whatever report the committee makes; and if the bill is not amended, it is read the third time in full exactly as it was when it came from the house. If the bill is passed by the senate without amendment, the engrossed bill which was received by the senate from the house is returned to the house in exactly the same form as it was when received from the house except that on the back of it are indorsements of the chief clerk of the senate showing the dates when it was read the first and second times, when referred to committee, when reported back and

when read the third time and the fact of passage. When the house receives the engrossed bill from the senate, the paper is delivered to the committee on enrolled bills, and from the engrossed bill that committee drafts an enrolled bill. The committee on enrolled bills returns the engrossed bill to the house, and with the engrossed bill delivers the enrolled bill to the chief clerk of the house. The presiding officers then sign the enrolled bill, and it is delivered to the Governor; and, if approved by that officer, the enrolled bill is at once filed with the Secretary of State, but the engrossed bill, as well as the original bill and the report of the committee containing the amendments, remains with the chief clerk of the house until after final adjournment when the clerk delivers those three papers to the secretary of state. Thus it is seen that the only paper sent to the senate is the engrossed bill. The paper which was originally introduced in the house and the report of the committee containing the amendments do not, after the bill is engrossed, leave the hands of the chief clerk of the house until after adjournment when they are delivered to the Secretary of State. The senate never sees or hears the original bill, nor does that body ever see or hear the original report of the committee, although every member of the senate does see a printed copy of the original bill and a printed copy of the report of the committee containing the amendments. But the reading clerk of the senate never reads the printed copy to the senate on the first nor on the second nor on the third reading, for he always reads from the engrossed bill, and on the third reading he reads the engrossed bill in full.

If House Joint Resolution No. 12 followed the usual course, and presumably it did, it was printed

after it was introduced in the house and read the
first time. It may be stated in this connection that a
joint resolution is almost always read in full on the
first reading, and of course is always read in full on
the last reading. A printed copy of the resolution
was laid upon the desk of every member immediately
after the resolution was printed. After the com-
mittee report was received in the house and the
amendments adopted, the amendments were printed
and a copy laid upon the desk of every member of
the two houses. After printing the amendments the
printer returned the committee report to the chief
clerk of the house, who then delivered the original
resolution of the committee and the committee re-
port to the chairman of the committee on engrossed
bills in order that the resolution as amended might
be engrossed. When the resolution was engrossed
the chairman of the committee on engrossed bills
returned the original resolution and the committee
report to the chief clerk of the house and at the same
time delivered the engrossed resolution to that officer.
The engrossed resolution was read in full, adopted
by the house and at once transmitted to the senate.
The original resolution and the committee report re-
mained in the hands of the chief clerk of the house
until after final adjournment, at which time he de-
livered those two papers to the Secretary of State.
The senate never saw the original resolution, nor
did that body ever hear it read. The only paper
which the senate heard or acted upon was the en-
grossed resolution. This paper, the engrossed reso-
lution, was read in the senate and referred and
delivered to a committee, reported back by the com-
mittee to the senate and finally adopted by the senate.
After adoption of the resolution by the senate the

engrossed resolution was returned to the house in exactly the same condition as it was when received from the house, except the indorsements made upon the back by the chief clerk of the senate. The chief clerk of the house delivered the engrossed resolution to the chairman of the committee on enrolled bills. When the enrolled resolution was drafted, it, together with the engrossed resolution, was delivered to the chief clerk of the house. The enrolled resolution was then signed by the speaker of the house and by the President of the senate and promptly filed with the Secretary of State. The engrossed resolution remained with the chief clerk of the house until after the close of the session, at which time it was delivered to the Secretary of State.

The presumption that H. J. R. 12 followed the usual course is confirmed by the journals, by the engrossed resolution and the indorsements on it, and by the enrolled resolution in the hands of the Secretary of State. The indorsements on the engrossed resolution, over the signature of the chief clerk of the senate, show that the engrossed resolution was the paper which the senate received from the house and acted upon.

Our conclusion, as previously explained, is that the presumption of regularity attaching to the enrolled resolution is not overcome by the journal. This conclusion is based upon the contents of the journal, read in the light of the practice of the legislative assembly as that practice is fixed by written laws, written rules and accepted parliamentary usage; and this conclusion which we have reached is not in anywise rested upon the indorsements on the back of the engrossed resolution, although, as we understand it, the plaintiff does not contend that

we have no right to examine the engrossed resolution. The engrossed resolution and the indorsements on it are pleaded in the answer, and for that reason we have referred to the engrossed resolution. If it is permissible to include in the calculation the engrossed resolution with its indorsements, our conclusion, although rested upon other grounds as previously explained, is still further strengthened. It must not be understood that we are deciding or even intimating that the legislative journals can or cannot be impeached by the original resolution or by the engrossed resolution, for it is not now necessary for us to decide that question. In the instant case, however, there is no conflict between the engrossed resolution and the journals: See 25 R. C. L. 902; and see also, *Mumford* v. *Sewall,* 11 Or. 67, 71 (4 Pac. 585, 50 Am. Rep. 462). In view of the practice followed by the legislative assembly, it is plain that the failure to insert in the senate journal a copy of the amendments to the resolution adopted by the house was the result of a clerical oversight. Ordinarily the clerk of the senate would have inserted with the printed copy of the original resolution a printed copy of the amendments; but he either overlooked the printed copy of the amendments or else he inserted a copy and it has since been lost. If the officers of the house performed their duties, and presumably they did, the only paper sent to the senate was the engrossed resolution. If the officers of the senate performed their duties, and presumably they did, the only paper read to the senate and acted upon by that body was the engrossed resolution. Thus it appears from what the journals themselves contain that the failure of the senate journal to show a complete copy of the amendments adopted in

the house is due to a clerical mistake or, if the copy was in truth inserted, it has since been lost: See 25 R. C. L. 901.

When we view the journals in the light of the facts as they are admitted to be by the parties, the conclusion is inescapable that the senate acted upon the engrossed resolution and upon no other paper. The engrossed resolution is admittedly a correct amalgamation of the original resolution and the house amendments. The enrolled resolution is concededly an exact transcript of the engrossed resolution. It is not denied that the enrolled resolution was submitted to and voted upon by the people. Hence, the House of Representatives, the senate, and the people voted upon and approved the same resolution. Our conclusion is that H. J. R. No. 12 was adopted by the legislative assembly in full compliance with the Constitution, and that therefore Article XI–C is now a part of our Constitution.

10. The remaining questions for decision relate to H. B. 203. It will be recalled that the only entry in the house journal referring to concurrence by the house in the senate amendments reads thus:

"House Bill 203, House concurred in Senate amend on motion of Korell."

Treating the concurrence of the house as the final passage of H. B. 203, then by force of Article IV, Section 19, of the Constitution the vote was required to be taken by yeas and nays; but the Constitution does not affirmatively state that the names of the members with the yeas and nays shall be entered in the journal, unless, as provided in Article IV, Section 13, two members request that the yeas and nays be entered on the journal: *State ex rel.* v. *Boyer,* 84 Or.

513 (165 Pac. 587). However, all persons will no doubt agree that the better and more satisfactory practice is to enter the yeas and nays with the names of the members on the journal. Since the Constitution only requires that the vote be taken by yeas and nays and provides that a constitutional majority is essential, and does not mandatorily require the entry of yeas and nays on the journal, and since the journal does affirmatively show that the amendments were concurred in and does not affirmatively show that the vote was not taken by yeas and nays and does not affirmatively show that less than a constitutional majority voted for concurrence, the presumption is that the vote was in fact taken by yeas and nays and that the constitutional majority voted for concurrence: *Emmons* v. *Southern Pacific Co.,* 97 Or. 263, 274 (191 Pac. 333); *State ex rel.* v. *Boyer,* 84 Or. 513, 522 (165 Pac. 587); *Portland* v. *Yick,* 44 Or. 439 (75 Pac. 706, 102 Am. St. Rep. 633).

11. The contention that H. B. 203 is void because it was not submitted to the people for their approval at the election held on June 7, 1921, is without merit. Section 26, it is true, authorized the Secretary of State to set aside for an affirmative argument two pages of the official pamphlet and authorized the President of the senate and the speaker of the house to appoint a committee to prepare and file with the Secretary of State an affirmative argument, but it is also true that the legislative assembly has not in fact directed that H. B. 203 be referred to the people. A committee was appointed to prepare an argument in support of Article XI–C, and that committee did prepare an argument in favor of Article XI–C and the argument was printed in the official pamphlet sent to the voters: House and Senate Journals

(1921), pp. 290 and 540. A committee was not appointed under Section 26 of H. B. 203 and of course no argument was prepared by any committee from the legislative assembly. These circumstances indicate that the legislative assembly treated Section 26 as a superfluity.

The senate committee on military affairs, it will be remembered, reported H. B. 203 back to the senate with proposed amendments and a recommendation that the bill be passed with such amendments. Among the amendments is one to "insert after Section 25 of the engrossed bill the following"; and then follows Section 26. The report was adopted.

After the adoption of the report of the senate committee on military affairs, the senate, as a special order, fixed a definite time for the consideration of H. J. R. 12 and H. B. 203. In the language of the senate journal "the Senate went into Committee of the Whole on motion of Joseph for the consideration of H. J. R. No. 12 and H. B. No. 203." The committee of the whole arose and reported "H. J. R. No. 12 and H. B. No. 203" back to the senate "with the recommendation that they do pass." The report was adopted. The next act of the senate was to call the roll and vote on the adoption of H. J. R. 12. Immediately after adopting H. J. R. 12, the senate voted to suspend the rules, and to read H. B. 203 "now" and to place it on final passage. According to the senate journal, the next act was the request of Senator Joseph for unanimous consent to strike out Section 26. The request was granted. H. B. 203 was then read the third time and passed by the senate. Thus it appears that the committee on military affairs suggested the insertion of Section 26; that when the senate resolved itself into a committee of

the whole house it considered H. J. R. 12 and H. B. 203; and that after the committee arose and reported and the report was adopted H. J. R. 12 was adopted. It is fair to assume that after the adoption of H. J. R. 12 it became apparent to Senator Joseph that Section 26 was superfluous, because the submission of H. J. R. 12 to the people was all that was necessary, and for that reason he requested unanimous consent to strike out Section 26 of the bill before the bill was read the third time. Evidently in the rush and hurry of business Section 26 was not struck out and the section went to the house as one of the amendments adopted by the senate. However, regardless of whether or not the senate intended to eliminate Section 26, the section is in fact in the act. If then we take Chapter 201 by its four corners, it is obvious that the statute contains nothing which required its submission to the people. Section 26 was a mere superfluity. When enrolled H. B. 203 was signed by the Governor, it was not necessary to do anything further.

12. The contention of the plaintiff that H. B. 203 is invalid because "not passed subsequent to or pursuant to" Article XI–C cannot be sustained. The principle announced by this court, speaking through Mr. Justice BURNETT, in *Libby* v. *Olcott,* 66 Or. 124, 132 (134 Pac. 13), and the rule approved and applied in a recent decision of this court, speaking through Mr. Justice McBRIDE, in *State* v. *Rathie,* 101 Or. 339 (199 Pac. 169, 177), determine the question adversely to the position taken by the plaintiff. See also *State* v. *Luther,* 56 Minn. 156 (57 N. W. 464); *Hammond* v. *Clarke,* 136 Ga. 313 (71 S. E. 479, 38 L. R. A. (N. S.) 77); 12 C. J. 721; 25 R. C. L. 908.

13. The contention that H. B. 203 is void "because it is not identified by" Article XI–C is without merit. Section 4 of Article XI–C ratifies, adopts and confirms "any act which has been passed by the legislative assembly which purports to execute and carry into effect the provisions of this section. * * *" The language of Article XI–C assuredly included H. B. 203. It was not necessary specifically to refer to H. B. 203 and point it out separately and apart from all other acts. It must be remembered that Article XI–C was submitted and adopted as a constitutional amendment and not as a mere statute. We know of no rule which made it necessary that Article XI–C specifically point out any individual act or acts intended to be confirmed. The purpose of Article XI–C was to confirm "any act." Hence, all acts coming within the class designated by the amendment were confirmed. It is probably true, however, that the legislative assembly believed that H. B. 203 was the only bill which would be passed by the legislative assembly. Furthermore, when the electors voted upon Article XI–C they voted presumably knowing that H. B. 203 would be confirmed if they approved Article XI–C; for the argument which was furnished by a committee, appointed from the legislative assembly to prepare an affirmative argument in support of Article XI–C, and printed in the official pamphlet which, in compliance with law, was sent to every legal voter in the state in part reads as follows:

"House Votes Unanimously.

"The legislative assembly at the last regular session passed the act providing that each veteran of the World War may borrow from the state up to $3,000 in the manner hereinafter explained, or may receive a cash bonus of $15 per month for each month

of service up to a total of $500. In the lower house the vote was unanimous. In the senate there were but two dissenting votes. To provide funds for carrying the act into effect it also was necessary for the legislature to adopt and submit to the people for their approval this constitutional amendment. The act while passed by the legislature and already signed by Honorable Ben W. Olcott, Governor of the State of Oregon, can become effective only if this constitutional amendment is adopted by the people. Otherwise, there will be no money available for making the loans or paying the bonuses to the service men.

"The legislative act must constantly be borne in mind in connection with the constitutional amendment. One point in particular is material. While the constitutional amendment authorizes loans to veterans in amounts up to $4,000, the act passed by the legislature fixes the maximum loan at $3,000. Therefore, $3,000 will be the largest amount that any service man can borrow from the state."

It is our opinion that Article XI–C was adopted in accordance with every requirement of the Constitution, and that Chapter 201, Laws of 1921, was legally enacted and is constitutional. The decree is affirmed.                                  AFFIRMED.

BURNETT, C. J., concurs in the result.