Argued September 20; affirmed September 23, 1938

MOORE *v.* SNELL

(82 P. (2d) 888)

In Banc.

*Walter L. Tooze*, of Portland (David H. Fertig, of Portland, on the brief), for appellant.

*Willis S. Moore*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for respondent.

BAILEY, J. This suit was instituted in the circuit court for Marion county, Oregon, by J. A. Moore against Earl Snell as secretary of state of the state of Oregon, to enjoin and restrain the defendant from printing or causing to be printed in the official voters' pamphlet of the state of Oregon, together with ballot titles therefor, house bill No. 159 and senate bill No. 17 of the 1937 legislative assembly, known respectively as chapters 492 and 210, Oregon Laws 1937; and further to restrain the said defendant from certifying to the respective county clerks of the several counties of the state of Oregon the ballot titles for said measures and from causing such measures and such ballot titles to be printed by said county clerks upon the official and sample ballots to be used at the general election to be held within the state of Oregon November 8, 1938. From a decree dismissing the suit after demurrer to the complaint had been sustained, the plaintiff appeals.

Two causes of suit are set forth in the complaint, in both of which causes the plaintiff alleges that he is the owner of real and personal property located within Marion county, Oregon, and as such owner he is required to pay taxes, as duly assessed and levied, to Marion county and the state of Oregon; and that the

suit is brought by him on his own behalf as a taxpayer of Marion county and the state of Oregon, and for all other taxpayers in the state similarly situated. It is then alleged that Earl Snell is the duly elected, qualified and acting secretary of state of the state of Oregon and that among other duties imposed upon him as such secretary of state he is required to do certain things "whenever a referendum petition against an act duly passed by the legislative assembly of the state of Oregon is prepared and signed by citizens and legal voters of the state of Oregon in manner and form as provided by law". Among such duties the said defendant is required, as alleged in the complaint, to prepare copies of the acts of the legislative assembly against which the referendum has been invoked, "together with ballot titles thereof as prepared by the attorney general, and cause the same to be printed in the voters' pamphlet, to be published and distributed by said defendant as by law provided; and it is also the duty of said defendant to cause such measure so referred, with ballot titles therefor, to be certified to the respective county clerks of the several counties of the state of Oregon in manner and form and within the time prescribed by law, for printing upon the official and sample ballots to be used at the general election within the state of Oregon at which such measure is to be submitted to the legal voters of said state of Oregon for their approval or rejection, as the case may be."

It is further alleged that the expense of printing such measures with the ballot titles therefor in the official voters' pamphlet is paid out of the general funds of the state of Oregon; that the said funds are provided by direct taxes on real and personal property; that the plaintiff is required as a taxpayer of the state of Oregon to contribute to such funds; that he is further re-

quired as a taxpayer of Marion county to contribute to the expense of placing such ballot titles on the official and sample ballots prepared for the legal voters of Marion county; and that the expense incident to the submission of any such measure for the approval or rejection of the legal voters of the state of Oregon substantially increases his taxes.

The foregoing allegations are identical in the two causes of suit. In the first cause it is further alleged that on or about March 9, 1937, there was filed in the office of the secretary of state "what purported and was claimed to be an act duly passed by the legislative assembly of the state of Oregon at the thirty-ninth legislative assembly of 1937, entitled: 'A bill for an act making it unlawful to license, possess, display, operate or play any game of chance; providing penalties for the violation thereof; repealing section 27-3304, Oregon Code 1935 Supplement; and declaring an emergency' ''; and that the said alleged act was and is known as house bill No. 159 and is designated as chapter 492, Oregon Laws 1937. It is then alleged that within the time provided by law certain named individuals duly filed with the secretary of state a referendum petition against "said alleged act"; that ballot titles were duly prepared for said act by the attorney general; and that within the time provided by law the said petition, containing the required number of signatures of registered legal voters of the state of Oregon, was completed and filed with the secretary of state.

The complaint further asserts that the defendant threatens to and will, unless restrained by order of court, cause said act known as chapter 492, together with the several ballot titles therefor, to be printed in full in the voters' pamphlet, and will, unless restrained, cause said ballot titles therefor to be certified to the

several county clerks of the state of Oregon, thereby "causing an expenditure of substantial funds or sums of money by the state of Oregon" and by the several counties of the state of Oregon, including Marion county. It is alleged that the threatened acts of the defendant are wholly unwarranted, unauthorized and contrary to law and if permitted will be illegal and void, for the following reasons: (1) that said chapter 492 is an act unconstitutional and void on its face in that it pretends to transfer judicial power to the executive branch of the state government; (2) that said alleged act was never duly and regularly adopted by the legislative assembly of the state of Oregon in manner and form as required by the constitution; and that the same was not legally filed in the office of the secretary of state as by law required. There is then copied into the complaint from the senate and house journals of the 1937 legislative assembly the procedure followed by the house and the senate with reference to said house bill No. 159 (chapter 492), concluding with the signing of the said bill by the speaker of the house and the president of the senate. It is not contended that the bill up to this point had not followed the regular constitutional method provided for the enactment of bills by the legislative assembly.

It further appears from the complaint, as therein quoted from the journal, that the bill, together with a veto message of the governor, was laid on the table of the house by motion of a member of the house; that a motion to take the bill from the table failed; and that a motion to take from the table "the veto message" of the governor also failed. Although the complaint does not allege the nature of the governor's veto message, it is stated by both the appellant and the respondent that the governor's veto was limited to the emergency clause only of house bill No. 159. From aught

that appears in the record, the house adjourned without taking from the table the enrolled bill or the veto message.

The second cause of suit has reference to senate bill No. 17, known as chapter 210, Oregon Laws 1937. After this bill had passed the senate as introduced, without amendments, it was referred to the revision of laws committee of the house, which committee reported back "that the bill do pass" with certain amendments. When the bill came on for final passage in the house a motion was made to refer it to the committee on judiciary, which motion failed. The house journal then contains the following statement: "Bill amended with unanimous consent on motion of Martin as follows: 'Delete the senate amendments.'" The house journal thus continues: "Bill sent to engrossing committee and it was found there were no senate amendments to the bill. Engrossing committee deleted the house amendments, assuming that Martin's motion included the house amendments." The bill was then read for the third time and in regard to that the journal recites: "On passage of the bill as amended the vote was: Yeas, 50; Nays, 8", recording the names of those who voted against passage of the bill and those who were absent, and concluding as follows: "Bill as amended passed and title of the bill stood as title of the act."

The next entry in relation to this bill is the following, in the journal devoted to senate proceedings: "Message from house announcing passage in same form as passed by senate and transmitting for enrollment." The journal entries of the house and senate further set forth in the complaint show that the bill was signed by the president of the senate and the

speaker of the house, and that the governor approved and signed the bill.

After this bill was filed with the secretary of state it was referred to the voters of Oregon by referendum petition, in the same manner as house bill No. 159. No question is raised as to the sufficiency of the petition. The only controversy is whether or not senate bill No. 17 had in fact been regularly enacted by the legislative assembly in the form in which it reached the office of the secretary of state.

The defendant filed a demurrer to the complaint, setting forth the following grounds: (1) that the plaintiff has not legal capacity to sue; (2) that the court has no jurisdiction of the subject-matter of the suit; and (3) that the complaint does not state facts sufficient to constitute a cause of suit.

The appellant in his brief, with reference to the first cause of suit, says: "The question involved is not one of whether the bill is constitutional, i. e., whether the law as enacted or attempted to be enacted is constitutional. The question is: Did the bill ever become a law, so as to entitle it to be filed?" It would appear from this statement of counsel for the appellant that he has abandoned his contention that the bill as enacted or attempted to be enacted by the legislature is unconstitutional and void on the ground that it pretends to transfer judicial power to the executive branch of the state government. This leaves as the only ground on which the appellant attempts to prevent the secretary of state from submitting this act to the electorate for its approval or rejection, that house bill No. 159 was not legally filed in the office of the secretary of state. In support of this contention the appellant asserts that after the bill was returned by the governor with his veto of the emergency clause,

both the bill and the veto message were laid on the table, and that the bill was never taken therefrom by the house. Hence it is argued that it is still on the table and that no one had any authority after the adjournment of the house to file the bill with the secretary of state.

Section 15 *a* of article V of the constitution of Oregon provides that: "The governor shall have power to veto single items in appropriation bills, and any provision in new bills declaring an emergency, *without thereby affecting any other provision of such bill.*" (Italics supplied.) The next section of this article, to wit, 15 *b*, is as follows: "Every bill which shall have passed the legislative assembly shall, before it becomes a law, be presented to the governor; if he approve, he shall sign it; but if not, he shall return it with his objections to that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider it. If after such reconsideration two-thirds of the members present shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present it shall become a law. But . . . if any bill shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, it shall be a law without his signature, unless the general adjournment shall prevent its return, in which case it shall be a law, unless the governor within five days next after the adjournment (Sundays excepted) shall file such bill, with his objections thereto, in the office of the secretary of state, who shall lay the same before the legislative assembly at its next session in like manner as if it had been returned by the governor."

Section 15 *b* explicitly provides the course which a bill shall take after it has been enacted by the legislature and before it becomes a law. Under that section the veto power of the governor, if exercised at all by him, applies to the entire bill and not to merely a part of it. On the other hand, under § 15 *a* the governor is granted power to veto single items in appropriation bills as well as any provision in new bills declaring an emergency. In the event that he exercises the veto power conferred upon him by this section and vetoes the emergency clause, other provisions of the bill are in no wise affected.

Under § 15 *b* it is expressly provided that in case the governor vetoes the entire bill he must do so within a certain limited time, and he must state his objections to the bill. He is further required, in order to make his veto effective, either to return the bill to the house in which it originated or to send it to the secretary of state within a specified time. Under § 15 *a*, the procedure to be followed by the governor and the time within which he shall exercise his veto power as to single items of appropriation or emergency clauses are not expressly prescribed.

It may further be pointed out that under § 15 *b* if the governor neither vetoes the entire bill nor signs the same and files it with the secretary of state within a given time, the bill nevertheless becomes a law.

When house bill No. 159, properly enrolled and bearing the signatures of the speaker of the house and the president of the senate, was presented to him, the governor, within the time prescribed by § 15 *b* for the exercise of his right to veto the whole bill, vetoed the provision therein contained declaring an emergency, and returned the bill, accompanied by his message, to the house. In this message he stated:

"House bill No. 159 contains an emergency clause. In order that these two companion measures may take effect at the same time and in order that citizens of Oregon who have invested their money in such machines and games in good faith may have an opportunity to dispose of the same, I am hereby vetoing section 5, the emergency clause of house bill No. 159, as authorized by article V, section 15 *a*, Oregon constitution. This veto does not affect any other part of the bill."

■ This action by the governor was in effect an approval of house bill No. 159 in its entirety except the emergency clause. Possibly because he thought that the provisions of § 15 *b* relating to the procedure to be followed when the entire bill is vetoed applied also to a veto of the emergency clause permitted by § 15 *a*, the governor returned the enrolled bill, with his veto message to the house. Whether or not this was a proper procedure to be followed by him in this instance, we are not called upon to decide. The fact that he did return the bill, accompanied by his veto message, when the return of the bill was not requested by the house, does not in any way affect "any other part of such bill". The action of the house in placing the bill, together with the veto message, on the table, and its refusal to take the bill therefrom amounted only to a refusal to take action with reference to the governor's veto of the emergency clause.

■ It is our opinion that house bill No. 159 without the emergency clause was duly and regularly enacted. The manner of its reaching the office of the secretary of state is unimportant, as neither the constitution, laws of this state nor rules of the house and senate provide the manner in which an enacted bill shall be transmitted from the legislature to the secretary of state.

Senate bill No. 17 was, as already stated, passed by the senate as originally introduced, without any amendments. On second reading of the bill in the house it was referred to the revision of laws committee for consideration. This committee reported it back with the recommendation that it pass with certain amendments. After the bill had been engrossed it came on for third reading and passage, and during a discussion of the bill a motion was made from the floor by a member of the house to "delete the *senate* amendments", and this motion was unanimously adopted. The bill was then sent back to the engrossing committee, which caused it to be re-engrossed without the amendments proposed in the house by the revision of laws committee. The bill as re-engrossed was in the same language as when passed by the senate. When the bill again came up for passage on third reading it was the bill in its re-engrossed form which was up for consideration. No one, from aught that appears in the house journal, questioned the right of the engrossing committee to eliminate the amendments to the bill which had been proposed by the house committee to which it had originally been referred.

This court in *Boyd v. Olcott*, 102 Or. 327, at 371 (202 P. 431), observed:

"The engrossed bill is simply an amalgamation of the original bill and the amendments. There are now at this stage of the proceeding three papers in the hands of the chief clerk: the original bill, the report of the committee, and the engrossed bill. At this stage the original bill and the report of the committee containing the amendments have become, so to speak, *functus officio*; and they do not again leave the hands of the chief clerk of the house until after final adjournment. When the bill is read the third time it is the engrossed bill which is read, and if passed by the house the paper

called the engrossed bill is the one which is transmitted to the senate. When the bill is read the third time it is read in full.''

■ The enrolled bill which was filed with the secretary of state is in the identical language of senate bill No. 17 as passed by the senate and of re-engrossed senate bill No. 17 as passed by the house. There is no merit in the contention that this bill was not legally passed.

We have considered the case on its merits and have not attempted to pass upon the question of whether or not the plaintiff is a proper party to bring this suit. In order that the secretary of state may not be hindered in performing his official duties in connection with the printing of the voters' pamphlets and the submission of these acts to the voters of the state for their approval or rejection, an early opinion of this court was believed imperative. We do not, however, intend to intimate that the plaintiff has or has not legal capacity to maintain this suit.

The decree of the circuit court is affirmed.

BELT, J., not sitting.